QUICKSILVER MINING CO. v. ANDERSON.

(Circuit Court of Appeals, Ninth Circuit.    September 4, 1917.)

No. 2941.

1. CORPORATIONS ☞432(12)—OFFICERS—SCOPE OF EMPLOYMENT.

In an action against a mining company to recover for services rendered in connection with the organization of a corporation for building of an electric railroad leading from the mine to a central point, and procuring of rights of way, etc., evidence *held* to warrant a finding that the president of the corporation who engaged plaintiff was acting within the scope of his authority.

2. CORPORATIONS ☞388(1)—ACTIONS—LIABILITY—AUTHORITY.

The president of a mining company, having suggested that the acquisition of transportation facilities would make the operation of the mine more profitable, was authorized to make a detailed report to the directors. He engaged plaintiff, who procured rights of way, obtained subscriptions, and organized a corporation for the building of an electric road from the mine to another point. The road in fact was never built. *Held* that, the president being authorized, the mining company could not defeat plaintiff's recovery on the ground that the building of the road was beyond its charter powers.

In Error to the District Court of the United States for the Second Division of the Northern District of California; Benj. F. Bledsoe, Judge.

Action by C. P. Anderson against the Quicksilver Mining Company, a corporation. There was a judgment for plaintiff, and defendant brings error. Affirmed.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

A. H. Jarman, of San Francisco, Cal., for plaintiff in error.
C. A. Herrington, of San Jose, Cal., for defendant in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge. The defendant in error recovered in the court below judgment for services alleged to have been rendered by him for the plaintiff in error under employment by its president. No question is here made regarding the fact of the performance of the services, nor concerning the value of them. The defense to the action in the court below was, and the basis of the contentions in this court is, that the enterprises in and about which the defendant in error was employed were beyond the scope of the powers conferred on the plaintiff in error by its charter, and, further, that they were not within the usual and ordinary business of the corporation, and therefore that its president was without authority to employ the defendant in error to render the services for which he sued and recovered.

The record shows that the plaintiff in error was incorporated by act of the Legislature of the state of New York April 10, 1866 (Laws 1866, c. 470), "by the name, style, and title of 'the Quicksilver Mining Company,' and by such name and title," the act provides, "shall have perpetual succession, and shall be capable of suing and being sued, impleading and being impleaded, and of granting and receiving, in its corporate name, property, real, personal and mixed, and of holding and improving lands in California or elsewhere, and to obtain therefrom any and all minerals and other valuable substances, whether by working or mining, leasing or disposing of privileges to work or mine such lands, or any part thereof, and to erect houses and such other buildings and works as may properly appertain to said business, and to use, let, lease or work the same, and to dispose of the products of all such lands, mines and works as they may deem proper." The act also, among other things, conferred upon the company power to make such by-laws as it should deem proper to enable it to carry out the objects of the corporation, and to alter, amend, add to, or repeal the same, provided that such by-laws should not be contrary to the Constitution of the state or of the provisions of the act of incorporation. The act also authorized the persons therein named as a body politic to elect persons to serve as directors of the corporation, a majority of whom should constitute a quorum for the transaction of business, and to hold their offices until their successors shall have been elected in accordance with the by-laws. It also declared it "lawful for said company to establish the necessary offices for the business of the company wherein their business is located, and to have their principal office in the United States, in such place as they may deem expedient, at which place it shall be lawful to hold all meetings for the transaction of the business of the company."

It appears from the record that the chief property of the company is that known as the New Almaden quicksilver mine, situate in Santa Clara county, Cal., the productive record of which, according to the brief of the plaintiff in error, is more than $150,000,000. It has been operated by the plaintiff in error for more than 40 years. The by-laws of the company provide, among other things, that "the corporate

powers of the company shall be exercised by a board of directors, and such officers and agents as they shall appoint," and that the directors shall hold "stated, special, or adjourned meetings at such times and places as they may deem most convenient and consistent with the interests of the company," and that "the directors shall have power to delegate, from time to time, such authority as they may deem necessary to the officers of the company or to any one or more members acting as a committee in order that the business of the company may at all times be transacted with promptness and dispatch." The office of the company was established in New York City, where it has always remained.

From June, 1909, until some time in June, 1913, C. A. Nones, a resident of New York, was a member of the board of directors and president of the company, and Miss M. A. Bowe, also of New York, was likewise a member of the board, and its secretary. In February, 1910, J. T. Tatham, who was at the time bookkeeper and cashier of the company at the mine, was by Nones appointed its general manager at a salary fixed by him. In June, 1911, Tatham was elected a director and treasurer of the company, and remained such until both he and Nones were removed from their respective offices by the board of directors in June, 1913.

The property of the company is situated about 12 miles southwesterly of the city of San Jose, upon the eastern foothills of the Coast Range, being connected with the city by a boulevard known as the Almaden road. Running through it for about three miles is a creek, called Almaden creek, fed by the waters from the Los Alamedes watershed. The property embraced about 8,500 acres, a large part of which consists of agricultural land. During Nones' presidency of the company he was much of the time at the mine, and certainly its directing head in so far as concerned its usual and ordinary business. While the main business of the company was undoubtedly the mining of quicksilver, which included the use of power developed from the waters upon its land, the record leaves no room for doubt that it also included the management and disposition of the by-products of its ores and of its extensive land holdings and waters and water rights. One of the by-products was paint; and it appears from the evidence without dispute that Nones, while in charge of the property as president, concluded that it was to the interest of the company to build a paint mill, and that upon his recommendation a resolution was adopted by its board of directors authorizing the construction of such a mill, not to exceed a cost of $8,000, and directing such steps to be taken "as may be necessary under the advice of our counsel for the formation of a company to conduct such business, with the understanding that all of the stock is the property of the Quicksilver Mining Company." Payment for the services performed in the procuring of the necessary information upon which that recommendation was made by the president of the company was manifestly just as much obligatory upon it, had the recommendation not been approved, as it was upon its approval.

In precisely the same way, as shown by the record, Nones, as president of the company, concluded, while in charge of the property, that

the waters of the creek that flowed through the company's land, and the value of its water rights, could and would be enhanced by procuring certain options òn neighboring lands, and that by an addition to the then existing dam in the creek, or the building of another dam, the company would be enabled to develop, more power for its own uses, and would, thereby be enabled to use and dispose of the waters to better advantage, and further concluded, while so in charge of the property of the company, that a large saving in the expense of hauling the company's ores to its reduction works by teams (a distance of about four miles), and in the expense of hauling its supplies from San Jose to the mine (a distance of about twelve miles), could be effected by the building of an electric road from the mine to San Jose by way of the reduction works and through a growing community, which was anxious for the construction of such a road, and would contribute, not only rights of way therefor, but give a substantial bonus besides. These matters, it appears from the minutes of the company introduced in evidence, were reported to its directors by its president in detail, with the reasons which formed the basis of his recommendations.

Respecting the water the president in his report stated, among other things, that "owing to the contract which we have with the county, it undoubtedly has to lease all pipes for a term of 50 years from the date we elect to lease same, subject to a donation of 100,000 gallons of water per day to the county. I recommend that as soon as these pipes are properly installed that this company notify the county of its intention to lease said pipes, and this company should then transfer to the water company which is now in existence all of the water rights, receiving in payment therefor all the stock of the water company," and among the reasons stated by the president for that recommendation were, in substance, that the company could increase its supply of water, could earn some revenue from its sale to water users along its line of pipes after the water should be first passed over the service wheels, and thereby transferred into power, and that, if a dam of sufficient depth was constructed upon the company's property, "it would store up sufficient water to supply 10,000,000 gallons of water per day; that they (the San Jose Water Company) would then rather buy our rights at more than a fair price, allowing us to retain the power privileges, than to run the chance of our becoming competitors against them in the water supply business." The minutes of the company show that, acting on that report and recommendation, on motion of Director Whicher, duly seconded:

"It was resolved that the officers of the company be authorized to transfer to the California Power Company all the water rights owned by the Quicksilver Mining Company, together with the lease of the pipes of the county of Santa Clara, said lease being for a term of 50 years, and in exchange therefor to receive all stock and other securities of the California Power Company."

The minutes further show that at the same meeting, on motion of Director Whicher, duly seconded, this resolution was adopted:

"The president is therefore authorized to sell and transfer these securities at a price of not less than $150,000 in cash or its equivalent, reserving, how-

ever, to the Quicksilver Mining Company the right for all power to carry on its business now and in the future, and for not less than 200,000 gallons of water per day."

The foregoing resolutions were adopted at a meeting held September 20, 1911. At a subsequent meeting of the board of directors, held March 18, 1912, the resolution of September 20, 1911, regarding the sale of the company's water rights, was rescinded, and in lieu thereof this resolution adopted:

"Resolved, that the officers of the company be authorized to transfer to the Senonac Power Company all the water rights owned by the Quicksilver Mining Company, together with the lease of the pipes of the county of Santa Clara, said lease being for the term of 50 years, and in exchange therefor to receive all stock and other securities of the Senonac Power Company, and the president is therefore authorized to sell and transfer these securities at a price of not less than $200,000 in cash or its equivalent, reserving, however, to the Quicksilver Mining Company the right for all power to carry on its business now and in the future, and for not less than 200,000 gallons of water per day."

The report of the president made to the board of directors at its meeting of September 20, 1911, regarding the proposed electric road, contained the following:

"Our maximum transportation tonnage has a daily capacity of not in excess of 20 tons, which we haul 7½ miles at cost of 60.2 cents per ton. For this service we were paying last year $1.25 per ton, and this saving has been effected by ownership of our teams. All of which has been paid for. In the near future we will have to consider the handling of not less than 60 tons daily and possibly 100 tons. We have reduced the cost of transportation as low as can be done, so that an increased tonnage will force us to purchase additional teams and will permit of no saving. Our calculations of hauling is based on 6 horses for every 8 tons. Only hauling 60 tons daily would cost us about $37, or about $12,000 per year. In addition to this amount we are constantly paying for the hauling of our groceries from San Jose to the mine, and we haul about 25 tons monthly, at a cost of about $4 per ton. Our entire hauling charges and feed bills amount to over $15,000 per year. I submit the proposition to the board regarding an electric road to be built from San Jose to the furnaces. There have been several meetings on this matter with the residents of the valley, who are unanimously in favor of this undertaking, and have so far subscribed in cash about $10,000; this being a donation for which they will receive neither stock nor bonds of the proposed road. I believe that this donation will amount to $15,000 before the road is built. Besides there has been granted to me personally, for about three-fourths of the distance a private right of way of 20 feet width, and also sufficient land for turnouts and stations. The balance of the right of way necessary will have to be acquired from the county, and will cost a few hundred dollars. I am of the opinion that, if a company were formed to operate and build this line, the line could be built by a certain contractor with whom I have talked in San Jose upon the following terms: Original cost of road would not exceed $110,000, to which would be added 10 per cent. for profit, and for this the contractor would receive 6 per cent. bonds of this railroad company, less amount of cash donated by residents. Said bonds to be guaranteed principal and interest by the Quicksilver Mining Company. The cost of hauling our own freight over this line this way would be very small. A 40-ton car as a trailer could be attached to any regular passenger car without further charge, and in addition to our saving for transportation, which will be in the neighborhood of over $15,000 per year, we would also be able to carry passengers and haul freight and express packages for residents along the line. A close calculation of the population between San Jose and Almaden, gauging the same for a distance of a mile east and west along the proposed line,

shows about 5,000 people; also three schools, with a daily attendance of 150 scholars. Also beg to call your attention to the benefits accruing to us from this electric road. Our acreage along the proposed lines is composed mostly of hills, which are nothing but grazing lands and worth not over $20 per acre. Should this line be built, these hills would be desirable building sites; we retaining our mineral rights, as has been the case in similar localities, to wit, Los Gatos and Saratoga, two places which are situated from 6 to 7 miles of our property. We also own 128 acres of land along the proposed line, which we could not sell for $48 per acre for agricultural purposes last year. This land is finely situated for a town site, and, although we have sold 10 acres at $110 per acre, we still have sufficient left to warrant setting out this land in one-half acre plots which would be sold easily at $150 per one-half acre plot. This proposition is worthy of the most serious consideration. I have devoted several months to it, and have obtained the approval of the majority of the property owners whose lands are along the proposed line of railway."

Regarding the foregoing report of the president with reference to the electric road, at the meeting at which it was presented it was, on motion:

"Resolved, that before taking action on an electric road to be built from San Jose to the mine, that the president furnish a complete specification, showing itemized costs, possible earnings, etc., to be submitted at a future meeting of the board."

Preceding the meeting at which the foregoing resolutions of the company were adopted, at a meeting of its board of directors held June 5, 1911, on motion of Director Swayne, duly seconded:

"The president was authorized to have Mr. Aaron, the company's counsel, prepare a resolution re California Power Company, to be submitted to the directors at the next meeting."

And in the deposition of Mr. Swayne, who was himself a lawyer of New York, appears, among other things, the following:

"Q. Do you know anything about the water rights belonging to the defendant company? A. Only what I have heard discussed from time to time among the directors. Q. At board meetings? A. Yes; I have never seen the property. Q. Did you ever hear discussed in a directors' meeting the proposition to construct an electric railway to extend from San Jose to New Almaden, where the works of the defendant company are located? A. Yes. Q. You also heard discussed in directors' meetings the development of the water rights and water powers owned by the company? A. Yes. Q. And the object and purpose in the development of the company's water rights and power was to enable the company both to use its power to greater advantage and to sell power, wasn't it? A. That was the plan. Q. You knew that the project of an electric railway line to connect the works with the city of San Jose was a project initiated for the benefit of the defendant company, didn't you? A. I knew that that plan was discussed; it was never authorized. Q. Was it ever objected to? A. Yes; seriously. Q. By whom? A. By Mr. O'Brien, Mr. Stern, and myself."

The record shows that the Senonac Power Company was incorporated, with a capital stock of 5,000 shares, 4,995 of which were issued to the Quicksilver Mining Company March 22, 1912, and 1 each to its president, Nones, its general manager and director, Tatham, and its attorney, Burnett, and Anderson and Brassy. Respecting the Senonac Power Company Mr. Swayne in his deposition says:

"That company was merely a subsidiary of the Quicksilver Mining Company. I believe it was organized and the transfer made, and subsequently it was dissolved."

Preceding which dissolution it appears the Senonac Power Company reconveyed the water and water rights to the Quicksilver Mining Company. It was, according to the record, in connection with the waters and water rights, so dealt with by the plaintiff in error, that a part of the services rendered by the defendant in error were performed under the employment of the president of the plaintiff in error. The other portions so performed were rendered in connection with the proposed building of the electric road. It appears from the record that along the Almaden road, between San Jose and the mine, is a thickly settled fruit-producing community, and that the defendant in error was employed by the president of the company to secure the necessary rights of way and franchises for the road; that at the suggestion of Nones the defendant in error arranged for a public meeting which Nones, as well as Tatham, the general manager of the company, attended, and at which meeting Nones explained, among other things, that the Quicksilver Mining Company needed better transportation, and that he supposed they did; that the mining company would pay for the building of the road and would take all of the stock, but that if any of the residents living along the line wanted any of the stock they could have it; that a committee was thereupon appointed to work with the defendant in error regarding a right of way for the road—Nones asking for a free right of way from San Jose to New Almaden. Nones subsequently appointed a civil engineer named Herrmann to make a survey in connection with the defendant in error of the right of way for the proposed road, and on the 6th day of September, 1911, he wrote a letter to the chairman of the committee, in which he said, among other things:

"I take pleasure in submitting to you my proposition for the consideration of the committee, namely: That your committee obtain and collect the contemplated subscriptions, and accept all rights of way subject to the provisions hereinafter set forth; that the commencement of the building of the railroad will not be later than December 6, 1911, and the completion of the building of the railroad will be within fifteen months thereafter; that the committee make such arrangements with me that upon the final completion of the building of the railroad they will deliver to me the cash collected upon subscriptions in a sum not less than $4,500 and convey to me or my assigns the right of way that may have been gratuitously offered or donated; the said cash and the conveyances for the rights of way last mentioned shall be delivered to two trustees consisting of Mr. J. F. Tatham and another person to be selected by the committee before the 6th day of December, 1911, to be held by such trustees, and to be delivered by them to me or my assigns on the completion of the building of the railroad; that I or my assigns will furnish the money requisite to pay for the rights of way where present options call for money payment after the receipt by me or my representative of all public franchises for running on such parts of the public highway as may be applied for."

The proposition so submitted having been accepted, the defendant in error proceeded to collect numerous subscriptions from the residents along the proposed line, and to secure rights of way therefor from such residents, as also franchises from the county of Santa Clara over roads of the county, following which the road was incorporated, to wit, October 19, 1911, under the laws of California under the name "San Jose & Almaden Railroad Company," with a

capital stock of $120,000, divided into 1,200 shares, of the par value of $100 each—the original subscribers being the defendant in error 1 share; Tatham, general manager of the mining company, 1 share; Burnett, attorney for the mining company, 1 share; Nones, president of the mining company, 117 shares; those issued to the defendant in error, Tatham and Burnett being indorsed in blank by them respectively. Tatham testified, among other things, as follows:

"I was vice president and treasurer of the San Jose & Almaden Railroad Company. The stock of this railroad company belonged to the Quicksilver Mining Company. About $5,000 was expended for the promotion of the preliminary work of this railroad company. The money paid out belonged to the Quicksilver Mining Company. I paid it out. A portion of it came from the office at New Almaden, and a portion came from the New York office; $3,000, I think, came from New York, and $2,000 from the office at the mine. A little work was done, cutting down a bluff to the entrance of the hacienda. It was done by the Quicksilver Mining Company and paid for by it. Surveys were made and paid for by the mining company. Abstracts were also secured, amounting to $225. The survey cost in the neighborhood of $500. These bills were paid for by the mining company."

Tatham also testified that, when the stock in the electric road company was issued to Nones, the latter said it was so issued in trust for the Quicksilver Mining Company—a fact which the whole record plainly shows. Indeed, in view of the facts disclosed by the record, we think it idle to contend that the court below was in error in concluding that the president of the plaintiff in error had at least implied authority to employ the defendant in error to perform the services for the value of which he sued and recovered. It is true that it appears that, about the time the defendant in error concluded his employment, he received in the office of the local attorney of the company the following instrument:

"New Almaden, Cal., March 5, 1912.

"C. P. Anderson, Esq., San Jose, Cal.—Dear Sir: For services rendered and to be rendered on the line of San Jose & Almaden R. R., I hereby agree to pay you the sum of forty-five hundred ($4,500) dollars, payable on completion of the road.

"Yours truly, Charles A. Nones."

And it is also true that in at least one place in the testimony of Nones he states that the defendant in error was employed, not for the Quicksilver Mining Company, but by himself individually. That statement of the witness is not only in conflict with other portions of his testimony, but in positive conflict with his report to the directors of the mining company respecting the building of the road, and in obvious conflict with this sworn statement made by him respecting the obligation so given to the defendant in error, made in his schedules filed in his bankruptcy proceedings, which subsequently occurred:

"Names of creditors: C. P. Anderson.

"Residences: San Jose, California.

"When and where contracted: San Jose, California, January, 1911.

"Nature and consideration of debt and whether any judgment, bond, bill of exchange, promissory note, etc., and whether contract as partner or joint contractor with any other person; and, if so, with whom; guarantee of payment for work done for Quicksilver Mining Company.

"Amount: $4,500."

[1, 2] It is nowhere pretended that Nones had any personal business anywhere in Santa Clara county. His sole business there, so far as appears, was as the representative and head of the mining company; his employment of the defendant in error in connection with the increase of the waters appertaining to the company's lands and the increase of power therefrom was plainly for and in the interest of the company which placed him in charge of the property; and so in respect to the employment of the defendant in error for the procuring of rights of way, franchises, and subscriptions for the proposed electric road, designed, as the president of the company expressly informed its board of directors, to reduce the expenses of the company in the matter of hauling its ores and supplies, and at the same time to earn for it money out of passenger traffic. Whether or not the construction of the road for such purposes was beyond the powers conferred upon the mining company is a question that does not arise in this case. As a matter of fact, as shown by the record, the road was not built, and the plaintiff in error proceeded no further than the organization of a corporation looking to its construction, and the payment of all the costs and expenses of the undertaking, so far as appears, except the fair worth of the services rendered in that behalf by the defendant in error under the employment of its president, in the circumstances that have been stated.

We see no merit whatever in any of the contentions of the plaintiff in error, and accordingly the judgment is affirmed.